STATE, Respondent v. RICHARDS, Appellant

(171 N.W.2d 808)

(File No. 10545. Opinion filed November 10, 1969)

**Charles E. Carrell,** Rapid City, for defendant and appellant.

**Gordon Mydland,** Atty. Gen., **C. J. Kelly,** Asst. Atty. Gen., Pierre, for plaintiff and respondent.

ROBERTS, Judge.

The jury returned a verdict finding defendant guilty of man-slaughter in the second degree and from the judgment thereon he has appealed.

Defendant was arrested on October 16, 1967. He had a preliminary hearing on November 6 and 7, 1967, at which defendant was represented by court appointed counsel who continued to represent him at the trial and on appeal. Defendant was arraigned on an information charging that he "wilfully and unlawfully, and feloniously did kill a human being, to-wit: Pedro Maestas, said killing being perpetrated without a design

to effect death and in a heat of passion, but in a cruel and unusual manner, said killing constituting neither excusable nor justifiable homicide, in violation of SDC 13.2013". The trial commenced on January 22, 1968, and the case was submitted to the jury on January 30, 1968.

The evidence discloses that the deceased Pedro Maestas, an itinerant laborer, age 48, resided with his brother in a motel in New Underwood. On the morning of October 14, 1967, at about seven o'clock deceased was found by a motorist lying on old Highway 14—16 about one mile east of New Underwood. The motor patrolman who was dispatched to the scene found Pedro Maetas lying on the tarvia-surfaced highway bleeding and unconscious. He called an ambulance which arrived within fifteen or twenty minutes. The victim died on the way to a hospital. The patrolman testified that he picked up about twenty pieces of glass within a few feet of the body which were introduced in evidence.

Dr. Harold Frost, who performed an autopsy, testified that there were cuts, bruises and abrasions about the head and face of the deceased, a severe cut on the forehead, a broken nose and skull fracture. The witness also testified:

"Q And the injuries, the cuts and the bruises and contusions, Doctor, what in your opinion could have caused these injuries that you found? A I believe that the head injury was caused by one or more blows by a heavy hard blunt object.

"Q And how about on the scalp and cuts on the scalp, and bruises you found there? A These could have been caused either from the fall as a result of the main injury, or they could have been caused by other blows.

"Q Such as blows from the fists or kicks, or something of that nature? A Yes, the cuts over the top of the head and the two bruises on the top of the head.

were not as severe as the one over the forehead, the one over the forehead was enough to crush the skull, those on top of the head were mere cuts or bumps. * * *

"Q From your examination, Doctor, would you have an opinion as to whether or not the injury that you found in the forehead could be caused by being struck by an automobile? A Yes.

"Q And what is that opinion? A I believe that if this head injury had been caused by a moving vehicle it would be enough to throw him to the ground violently, and that he would have sustained other injuries to other parts of the body than just the head because of this I believe that his injuries were not sustained from a moving vehicle. * * *

"Q Is there anything about the size or dimensions of the fracture that you found that in your opinion would lend support to a statement that the blow had been received by a bottle, say of a quart or a fifth size? * * * A I think a bottle of that size could do it."

About an hour before midnight on October 13th, deceased accompanied by Richard Hunter went to a house in New Underwood occupied by Annie DuBray, a middle-aged Indian woman, and Steve Hopkins. Deceased and Hunter brought with them a fifth of whiskey and a six-pack of beer and were joined in a drinking party by Mrs. DuBray, Steve Hopkins and the defendant, a twenty-two year old Indian youth who was in the house at the time of the arrival of deceased and his companion. Within an hour Maestas, Hunter and Hopkins left and returned with more whiskey and beer and the party continued. There was testimony that deceased asked Hopkins and defendant to return with him to his motel for a drink of wine. Other facts and circumstances as disclosed in the record are that Maestas suggested that he and his two companions drive some place in the country. They drove a mile and a half south of New Under-

wood, parked and drank more wine. They then returned to New Underwood and drove east on old Highway 14—16 and parked near the place where the unconscious Pedro Maestas was later found. Defendant and Hopkins returned to town in the Maestas car and parked it at the motel. They arrived at the DuBray dwelling at about 5:30 in the morning.

Defendant seeks reversal on the grounds: (1) That an extended examination of the state's witness, Steve Hopkins, by the court and the asking of leading questions of this witness during the course of the trial deprived defendant of a fair trial and (2) that the evidence was insufficient to support the verdict.

The state's witness, Steve Hopkins, was questioned by the state's attorney as to events after he left deceased's apartment and he answered that he "was drunk" and "didn't remember". Then the following questions and answers appear in the record: "Q (By Mr. Lehnert) Are you telling me, Steve, at this point you don't remember anything else, is that what you are saying? A Yes. Q When does your memory return to you, what's the next thing you remember? A I was home. Q Next thing you remember is being home? A Yes. Mr. Lehnert: Your Honor, the State at this time would request on the basis of surprise, and the basis that this witness has become a hostile witness, the right to cross-examine."

At this point in the trial, the jury was excused and the court in chambers conducted an examination of the witness. In the course of the examination the court read the questions and answers of the witness at the preliminary hearing and then asked him if he actually remembered what happened the night in question and if he testified to the truth at the preliminary hearing. To this inquiry the witness replied in the affirmative. In State v. Rief, 53 S.D. 438, 221 N.W. 53, where the trial judge called and examined in the presence of the jury an unwilling witness for the state, it was stated that the examination appeared to have had for its object only the eliciting of the truth without any display of bias or unfairness and that it could not be said that the conduct of the judge was improper.

▉ A trial judge is not a mere moderator, but has the duty to control the conduct of a trial and within proper limits may examine witnesses for the purpose of eliciting facts material to the case and in the interest of justice. 53 Am.Jur., Trial, §§ 74, 75. The examination was out of the presence of the jury and no indication to the jury of the opinion of the trial judge as to the credibility of the witness or merits of the case could have resulted. There is no claim that the examination was conducted in a manner hostile to the witness.

▉ It is further contended that the trial court erred in permitting the state to ask the witness, Steve Hopkins, leading questions on direct examination. In State v. Cambron, 20 S.D. 282, 105 N.W. 241, this court said: "We are of the opinion that there was no error committed by the court in this ruling. It is clear from the evidence that the witnesses interrogated were unwilling witnesses and unfriendly to the prosecution, and in such case the court is authorized to permit leading questions to be asked the witnesses, and the contention that it was a matter for the jury to determine whether or not the witnesses were unwilling witnesses and were such as might be asked leading questions was a matter for the jury, is certainly untenable. It is for the court to determine whether or not the manner and conduct of the witnesses are such as to show them unwilling witnesses to whom counsel can propound leading questions." See also SDCL 1967, § 15-6-43(b). The witness was obviously evasive and unwilling to testify. The discretion of the court was properly exercised in permitting the state's attorney to ask leading questions.

When the jury was recalled and the examination of the witness Hopkins was resumed, he testified as follows:

"Q You went out east of New Underwood past a cemetery someplace? A Yes.

"Q Who was driving at this time? A Gary (defendant).

"Q Were you on—all in the same position in the car? A Yes.

"Q Pedro in the middle, you are on the outside? A Yes.

"Q How far out east of New Underwood did you drive?
A Mile and a half. * * *

"Q Did you stop when you got out there? A We stop-
ped someplace on the road a mile and a half out
of town on the road.

"Q And what did you do when you stopped? A Well,
I didn't quite—arguing about something, but I didn't
remember that.

"Q Who was arguing? A Pedro and Gary.

"Q You don't remember what the argument was about?
A No, sir.

"Q What happened after the argument? A Well, I
guess Gary got out and he pulled Pedro out. * * *

"Q You say Gary had the bottle of wine? A Yes.

"Q That's your best recollection? A That's it.

"Q When they got out of the car what happened? A
I don't know, I don't remember.

"Q Did you see anything at all out there? A No, sir.

"Q Did you hear anything? A No, sir, I didn't. * * *

"Q And when Gary got into the automobile did you
have some conversation with him? A No, he said
himself, he said, 'I think I kill that—I think I done
it', he said.

"Q What else did he say? A He said, 'I think I killed
a Mexican, Spaniard.'

"Q Anything else, you remember? A That's all.

"Q What did you do when Gary got back in the car?
A Went back to the house.

"Q Did he have anything with him when he got back
in the car? A No, sir.

"Q No wine bottle? A No, I don't see any.

"Q And when you got back in the car where did you
say you went? A We went back to the house.

"Q To New Underwood? A Yes, to New Underwood."

Defendant testified in his own behalf. His testimony was not
in substantial conflict with testimony produced by the state
as to how he met the victim and happenings before the trio
parked on the highway where the alleged crime was committed.
Defendant admitted that he pulled Pedro Maestas out of the car
and struck and knocked him to the ground, that when deceased
staggered to his feet he struck him first in the stomach and then
in the face with his knee and that blood dripped on his hands
and wrists when he stood up the victim bleeding from his nose
and mouth. He denied that he struck deceased with the wine
bottle.

On cross-examination, defendant gave the following answers:

"Q This Pedro, he was pretty drunk out there when you
got in a fight with him, wasn't he? A That's correct.

"Q You didn't have any trouble hammering on him,
did you? A No, sir.

"Q You didn't even have to hit him, did you? A No,
sir.

"Q You could have just held him, couldn't you? A Yes.

"Q And he couldn't have hurt you a bit, could he?
A That's correct."

█ It would serve no useful purpose to recite the testimony of other witnesses. There was ample evidence submitted by the state if believed by the jury and facts testified to by defendant to warrant the verdict returned. The jury saw and heard the defendant and the other witnesses and it was its function to determine credibility and the weight to be given the evidence.

Judgment affirmed.

All the Judges concur.